666 A.2d 592

LINDA GARDNER AND THOMAS GARDNER, PLAINTIFFS–
APPELLANTS, v. MYRON PAWLIW, M.D.,
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 27, 1995—Decided November 6, 1995.

114

Before Judges SKILLMAN, PAUL G. LEVY and EICHEN.

*Albert J. Brooks, Jr.* argued the cause for appellants (*Sheller, Ludwig & Badey,* attorneys; *Mr. Brooks* and *Nancy G. Rhoads* admitted *pro hac vice* on the brief).

*Hugh P. Francis* argued the cause for respondent (*Francis & Berry,* attorneys; *Mr. Francis* and *John W. O'Farrell,* of counsel; *Beth A. Hardy* and *Peter A. Olsen,* on the brief).

The opinion of the court was delivered by

SKILLMAN, J.A.D.

This is an appeal from the dismissal of a medical malpractice action. Plaintiffs allege that defendant, who was Mrs. Gardner's obstetrician, failed to diagnose a defect in the umbilical cord leading to the fetus being carried by Mrs. Gardner, and as a result, defendant failed to induce an early delivery that would have offered the fetus an opportunity to survive. The trial court dismissed at the close of all evidence on the ground that plaintiffs had failed to present evidence of a proximate causal relationship between defendant's alleged malpractice and the death of the baby.

Mrs. Gardner, who was then thirty years old, became pregnant in May 1988 and was due to deliver on January 20, 1989. Since she had suffered two prior miscarriages and was taking fertility drugs, Mrs. Gardner's pregnancy was characterized, at least for certain purposes, as "high risk." However, the actual course of her pregnancy was routine.

The alleged malpractice occurred at a regularly scheduled visit to defendant's office on December 21, 1988, approximately one month before the anticipated delivery date. According to Mrs. Gardner, she informed defendant at that time that she had "noticed the slowing down of my baby's activity . . . and . . . had a watery discharge . . . that started to occur that day . . . that I had never had before." Defendant responded that neither of these observations were causes for alarm and took no further action.

According to Mrs. Gardner, the fetus was less active than normal during the next three days, then became more active on December 25, 1988, but stopped moving completely after that date. Consequently, she called defendant on the morning of December 27, 1988, and went to his office shortly thereafter. Defendant examined Mrs. Gardner and had an ultrasound scan and a biophysical profile conducted. Those tests revealed that the baby had died in the uterus. Defendant induced the delivery of the dead fetus the next day.

Plaintiffs alleged that defendant committed malpractice by failing to perform a "nonstress test" and "biophysical profile" after Mrs. Gardner reported during the December 21, 1988, office visit that she had noticed decreased activity of the fetus and had a watery discharge. Plaintiffs presented two expert witnesses to support their malpractice claim, Dr. James Lewis, a forensic pathologist, and Dr. Marvin Kalafer, an obstetrician.

Dr. Lewis testified that the cause of the baby's death was that the umbilical cord was less than normal length and connected "at the edge" rather than in the middle of the placenta. As a result, the fetus failed to receive adequate oxygen and nutrients. Dr. Lewis indicated that the baby had been dead for two or three days prior to being delivered on December 28, 1988, making the probable date of death December 25, 1988. Dr. Lewis further indicated that the baby was "normal," although its organs were "slightly smaller" than would be expected at Mrs. Gardner's stage of pregnancy. The only opinion Dr. Lewis expressed regarding the condition of the fetus on December 21, 1988, was that it was "alive." Dr. Lewis did not express any opinion regarding the care that defendant provided to Mrs. Gardner.

The testimony of plaintiffs' other liability expert, Dr. Kalafer, was presented by a videotaped deposition. See R. 4:14-9. Dr. Kalafer testified that Mrs. Gardner's "marked decrease in fetal activity" was "very significant" because "[i]t is something that often alerts the physician that there might be a potential problem." He also expressed the opinion that defendant's failure to perform any tests when Mrs. Gardner reported a decrease in fetal activity constituted a deviation from the accepted standard of prenatal care:

> I feel that ... in this setting, a patient who is considered a high-risk individual who has had miscarriages in the past who has received extra medication during pregnancy, that it was important to follow-up on that particular complaint of a patient and perhaps perform a study which would help determine if the baby was in an environment that was normal. Specifically, I feel it would be important to perform a nonstress test along with the biophysical profile at that time.

When asked whether the baby would have survived if it had been delivered on December 21, Dr. Kalafer testified:

> I don't know. However, if one would have performed a study and if that study indicated that there was a smoldering in utero environment, one would have acted on that and most likely the baby would have been able to survive on the outside being given the fact that even though this is not a term baby, it is very close to term; and in the setting such as a neonatal intensive care unit, one could monitor the baby, and the biggest concern really at that point might be lung maturation.

Plaintiffs' counsel then asked the following question:

> Do you have an opinion held to a reasonable degree of medical probability as to whether it was probable that if Dr. Pawliw performed tests on the day of December 21, that it would have shown any effects of the placental and cord abnormalities?

After an objection by defendant's counsel and colloquy among counsel and the witness, Dr. Kalafer responded:

> My answer is yes.
>
> . . . .
>
> I feel that if a study would have been performed, one could utilize that knowledge to help better manage the pregnancy. If the test would have been normal, it would have been reassuring. If the test would have been abnormal, then I believe one would have been pushed to deliver this baby.

When asked for his opinion as to whether defendant's failure to conduct testing on December 21 increased the risk that the baby would die, Dr. Kalafer stated:

> If a study would have been performed such as the nonstress test and biophysical profile, one could utilize that information; and if it was abnormal, the baby could have been delivered most likely in a setting more appropriately, and the baby could most likely live in the outside world.

And when asked whether the baby's death was substantially caused by defendant's failure to conduct testing on that date, Dr. Kalafer answered:

> [I]f these studies were performed, it would have helped the doctor to continue the in utero life or basically either decide that this baby does not have to be delivered or just continue close monitoring.

On cross-examination, Dr. Kalafer gave the following testimony regarding the tests that he asserts defendant should have conducted on December 21:

> Q. Now, a nonstress test is either reactive or nonreactive, is that correct, sir?
> A. That is how it is qualified, yes.

Q. Would it be fair to say, sir, that you cannot state within a reasonable degree of medical probability that a nonstress test, had one been done on December 21, 1988, would have been nonreactive?

A. I cannot state that, that is right, since one wasn't done.

. . . .

Q. Correct me if I am wrong, doctor, but it is my understanding that a biophysical profile is either reassuring or non-reassuring, is that the terminology that you used, sir?

A. That is one way to describe it, but you can also quantify it perhaps a little bit better.

Q. Would it be fair to say, sir, that you cannot state within a reasonable degree of medical probability that had a biophysical profile been performed on December 21, 1988 it would have been non-reassuring?

A. I can't state that because one wasn't done.

On re-direct examination, Dr. Kalafer testified:

Q. Doctor, you said that you cannot state with certainty or probability what a nonstress test would have shown if performed on December 21. I want to ask you: Can you say to a reasonable degree of medical probability as to whether by failing to do a nonstress test there was an increased risk that a condition which could cause the baby's death would not be recognized?

A. Yes.

. . . .

Q. Similarly you said that you cannot state with medical probability what a biophysical profile would have shown if performed on December 21. I want to ask you: Can you state with a reasonable degree of medical probability as to whether by failing to do a biophysical profile there was an increased risk that a condition which could cause the baby's death would not be recognized?

. . . .

A. Yes.

Defendant's liability expert, Dr. Sidney Wilchins, an obstetrician, testified that the decrease in fetal activity and the watery discharge reported by Mrs. Gardner in her December 21, 1988, appointment with defendant were not unusual, and since the examination of Mrs. Gardner did not reveal any abnormality, defendant did not deviate from the accepted standard of obstetrical care in not ordering any tests to be conducted. Dr. Wilchins also testified that it was a "medical certainty" that neither a nonstress test nor a biophysical profile, which do not measure the length of the umbilical cord or the location of its attachment to the placenta but only whether the fetus is "in stress," would have

indicated any abnormality in the fetus as of December 21, 1988. Dr. Wilchins testified that the ultrasound test conducted on December 27, 1988, showed "a normal amniotic fluid index" and that "[y]ou could not have had a compromised fetus on the 21st and have had normal amniotic fluid on the 27th." Dr. Wilchins also testified that the autopsy conducted a few days later showed only "faint meconium staining," and that if the fetus had been in distress as early as December 21, the autopsy would have revealed dark green meconium staining in both the placenta and fetus. Based on these post mortem tests, Dr. Wilchins concluded that the results of any nonstress test or biophysical profile conducted on December 21, 1988, would have been "perfectly normal."

The trial court concluded that plaintiffs presented sufficient evidence to establish a jury question as to whether defendant deviated from the accepted standard of care by failing to order either a biophysical profile or nonstress test when Mrs. Gardner complained of a decrease in fetal motion on December 21, 1988. The court also concluded that plaintiffs presented sufficient evidence that if these tests had revealed abnormalities and the baby had been delivered on December 21, it probably would have survived. However, the court concluded that plaintiffs failed to present any evidence from which the jury could find that defendant's alleged malpractice was a proximate cause of the baby's death:

> It is not enough for [Dr. Kalafer] to say, I cannot state since the test wasn't done whether or not there would have been an abnormal test. He is refusing to answer the question, and thus in not answering is not providing the basis that is necessary for the plaintiff to get to the Jury.
>
> . . . .
>
> So [Dr. Kalafer] will not answer the question .. as to whether this test, to a degree of medical probability ... [m]ight have turned out abnormal. ... There is a possibility it would have been abnormal. Possibility in the law is not enough. There must be a probability that this test would have been normal. And I don't know how to quantify that. Maybe 30 percent is enough. Maybe 40 percent. We don't have that testimony. But a possibility is not enough. Unless there was an abnormal test there would be no reason for intervention by this gynecologist in an early delivery. ... It becomes critical, then, as a matter of proximate cause, a causative link under *Scafidi* that the doctor's failure to take this test had to

increase the risk that the child's stress would be undiagnosed and timely intervention not had. And that's the testimony Dr. Kalafer will not give.

On appeal, plaintiffs argue that the trial court erred in concluding that they failed to produce evidence of the required causal relationship between defendant's alleged malpractice and the death of their baby.[1] We agree with the trial court's conclusion as to the inadequacy of the evidence on causation and therefore affirm the dismissal of plaintiffs' complaint.

■ A modified standard of proximate causation governs actions in which a doctor's alleged malpractice has combined with a preexisting condition to cause harm. *Scafidi v. Seiler,* 119 *N.J.* 93, 101–09, 574 *A.*2d 398 (1990); *Evers v. Dollinger,* 95 *N.J.* 399, 413–17, 471 *A.*2d 405 (1984). "In the routine case in which the plaintiff's injury can be traced to a single cause, the standard instruction on proximate cause ... describes it as 'a cause which necessarily set the other causes in motion and was a substantial factor in bringing the accident about * * *,' and further as a 'cause which naturally and probably led to and might have been expected to produce the accident complained of.' " *Scafidi v. Seiler, supra,* 119 *N.J.* at 101, 574 *A.*2d 398 (quoting Model Jury Charges (Civil) § 7.11). However, since "[t]he language of the standard charge assumes that the defendant's negligence began a chain of events leading to the plaintiff's injury," it is "self evident" that this standard charge could "confuse or mislead a jury" in a case "in which the defendant's negligence combines with a *preexis-*

---

[1] Plaintiffs also argue that the trial court erred in concluding that plaintiff Thomas Gardner failed to present evidence that he suffered any compensable damages as a result of defendant's alleged malpractice. However, the trial court, although commenting upon this issue, found it unnecessary to decide in light of the dismissal of the complaint based on the absence of evidence of proximate causation. Therefore, we do not view the issue as properly before us. In any event, it would be unnecessary to decide the issue in view of our affirmance of the dismissal on the basis of the absence of evidence of the required causal relationship between defendant's alleged malpractice and the death of the baby.

*tent* condition to cause an injury." *Id.* at 102, 574 *A.*2d 398. Consequently, the Court has adopted a "standard of causation" to govern such cases that is "more flexible than that used in conventional tort claims." *Id.* at 103, 574 *A.*2d 398 (quoting *Evers v. Dollinger, supra,* 95 *N.J.* at 413, 471 *A.*2d 405). Under this modified causation standard, plaintiff must present "[e]vidence demonstrating within a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a preexistent condition." *Id.* at 108, 574 *A.*2d 398. If plaintiff satisfies this burden, it "raises a jury question whether the increased risk was a substantial factor in producing the ultimate result." *Ibid.*

The requisite causal connection between a doctor's alleged malpractice and the alleged resulting harm to the patient ordinarily must be established through expert medical opinion testimony. *See Germann v. Matriss,* 55 *N.J.* 193, 205, 260 *A.*2d 825 (1970); *see also Lanzet v. Greenberg,* 126 *N.J.* 168, 195, 594 *A.*2d 1309 (1991) (Pollock, J., dissenting). Such testimony may not consist of "[a]n expert's bare conclusions, unsupported by factual evidence." *Nesmith v. Walsh Trucking Co.,* 123 *N.J.* 547, 549, 589 *A.*2d 596 (1991) (quoting *Buckelew v. Grossbard,* 87 *N.J.* 512, 524, 435 *A.*2d 1150 (1981)). "The weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which that opinion is predicated." *Johnson v. Salem Corp.,* 97 *N.J.* 78, 91, 477 *A.*2d 1246 (1984) (quoting *N.J. Rules of Evidence* (Annot.1984), comment 7 to Evidence Rule 56, at 360). "This need for supporting data and a factual basis for the expert's opinion is especially important when the opinion is seeking to establish a cause and effect relationship." *Rubanick v. Witco Chem. Corp.,* 242 *N.J.Super.* 36, 49, 576 *A.*2d 4 (App.Div.1990), *modified on other grounds,* 125 *N.J.* 421, 593 *A.*2d 733 (1991).

Plaintiffs failed to present any evidence to show the required causal connection between defendant's alleged malpractice

and the death of their baby.[2] Plaintiffs' theory was that the placenta and cord abnormality would have caused fetal distress—what plaintiffs' medical expert Dr. Kalafer called a "smoldering in utero environment"—that would have been detected if defendant had ordered a nonstress test and a biophysical profile on December 21, 1988. However, plaintiffs presented no expert opinion to support this theory. Although Dr. Kalafer indicated that a nonstress test and biophysical profile would reveal fetal stress, he did not express an opinion that the fetus was in fact in stress on December 21, 1988. Consequently, Dr. Kalafer was unable to state "within a reasonable degree of medical probability" that either test would have produced positive results that could have led to the early delivery of the baby. Since plaintiffs failed to present any evidence regarding the condition of the fetus on December 21, 1988, they did not discharge their burden of "demonstrating within a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a preexistent condition." *Scafidi v. Seiler, supra,* 119 *N.J.* at 108, 574 *A.*2d 398.

Plaintiffs argue that sufficient evidence of the required causal connection between defendant's alleged malpractice and the baby's death was provided by Dr. Kalafer's affirmative answer to the question,

> Doctor, you said that you cannot state with certainty or probability what a nonstress test would have shown if performed on December 21. I want to ask you: Can you say to a reasonable degree of medical probability as to whether by failing to do a nonstress test there was an increased risk that a condition which could cause the baby's death would not be recognized?

However, Dr. Kalafer's answer constituted a bare conclusion, unsupported by any opinion as to the critical underlying fact of the fetus's condition as of December 21, 1988. Moreover, the question

---

[2] Since we conclude that the trial court correctly granted defendant's motion to dismiss on the ground that plaintiffs failed to present evidence of proximate causation, we have no need to decide whether the evidence of malpractice presented by plaintiffs would have been sufficient to require submission of that issue to the jury.

to which this answer was given, although couched in the language of probability, could have been answered affirmatively even if Dr. Kalafer believed that there was an extremely remote possibility that the tests would have produced a positive result. The failure to order a nonstress test and biophysical profile could be said to have "increased [the] risk that a condition which could cause the baby's death would not be recognized" even if there was only a slight chance that the tests would have revealed a fetal defect. Such a remote possibility would not provide any evidential foundation for the jury to find that "the increased risk" from failing to give the tests was "a substantial factor in producing the ultimate result" of the baby's death. *Scafidi v. Seiler, supra,* 119 *N.J.* at 108, 574 *A.*2d 398; *see Sochard v. St. Vincent's Medical Ctr.,* 8 *Conn.App.* 6, 510 *A.*2d 1367, 1369 (1986) (holding that a medical malpractice claim based on an alleged decreased chance of survival should not be submitted to the jury in the absence of evidence that decedent suffered from the particular cardiac condition that would have been detected by the monitoring device that defendant failed to install); *Zueger v. Public Hosp. Dist. No. 2 of Snohomish County,* 57 *Wash.App.* 584, 789 *P.*2d 326 (1990) (holding that a medical malpractice claim based on an alleged decreased chance of survival should not be submitted to the jury in the absence of evidence of a "substantial reduction in the chance of survival").

The kind of evidence required to establish that defendant's alleged malpractice was a proximate cause of the death of plaintiffs' baby is illustrated by *Roses v. Feldman,* 257 *N.J.Super.* 214, 608 *A.*2d 383 (App.Div.1992) which, like this case, involved an alleged negligent failure to order diagnostic tests.[3] The plaintiff in *Roses* suffered from lung cancer, and the alleged malpractice consisted of defendant's failure to take chest x-rays when plaintiff first reported possible symptoms of lung cancer. *Id.* at 215, 608

[3] A more detailed illustration of the kind of evidence that will satisfy a plaintiff's burden to show that a doctor's negligent failure to perform a diagnostic test was a substantial factor in causing harm to a patient may be found in *Snead v. United States,* 595 *F.Supp.* 658, 665–67 (D.C.1984).

*A*.2d 383. Plaintiff's medical expert testified not only that the failure to take x-rays constituted a deviation from the standard medical practice but also that x-rays would have revealed lung cancer:

> [Plaintiff's expert testified] that if such x-rays had been taken, both x-rays, or at worst the April 1984 x-ray, would have disclosed the presence of the tumor and led to a diagnosis of the lung cancer.
>
> [*Id.* at 216, 608 *A*.2d 383.]

Based on his opinion that plaintiff's lung cancer would have been diagnosed if x-rays had been taken sooner, plaintiff's medical expert expressed the further opinion that "this delay [in diagnosis] increased the risk that [plaintiff] would lose the opportunity for treatment of the cancer at an earlier stage and before it had metastasized." *Id.* at 218, 608 *A*.2d 383. Consequently, the court concluded that plaintiff's expert had "expressed an opinion that, within a reasonable degree of medical probability, defendant's negligence in failing to take an x-ray increased the risk of harm posed by the existing malignancy," and that "[t]his was sufficient to create a jury question whether the increased risk was a substantial factor in producing the ultimate result." *Ibid.*

For plaintiffs to have established a comparable foundation regarding the required causal connection between defendant's alleged malpractice and the baby's death, Dr. Kalafer would have to have expressed an opinion, based on Mrs. Gardner's description of her condition on December 21, 1988, and the results of the post mortem tests, that a stress test and biophysical profile would have revealed that the fetus was in stress on December 21. However, Dr. Kalafer did not express any opinion regarding the condition of the fetus on December 21, and thus, he could not express any opinion concerning the probability (or even the possibility) that the tests would have revealed any fetal abnormality as of that date. On the other hand, based on the autopsy report and the ultrasound performed on December 27, 1988, defendant's liability expert, Dr. Wilchins, testified that it was a "medical certainty" that a nonstress test and biophysical profile would not have revealed any abnormality as of December 21, 1988. Therefore, the only expert opinion offered at trial on the issue directly negates the existence

of any causal connection between defendant's alleged malpractice and the death of plaintiffs' baby. Since there was no foundation in the record for the court to find that defendant's alleged malpractice increased the risk that plaintiffs' baby would not survive or for the jury to find that the increased risk was a substantial factor in the baby's death, the trial court correctly dismissed plaintiffs' complaint.

Affirmed.