691 A.2d 369

GERALDINE GREENE, INDIVIDUALLY AND AS ADMINISTRA-
TRIX OF THE ESTATE OF WILLYONNA GREENE, DE-
CEASED, PLAINTIFF–APPELLANT, v. MEMORIAL HOSPITAL
OF BURLINGTON COUNTY, A NEW JERSEY HOSPITAL COR-
PORATION, DONNA BLICKLE, R.N., JULIE FENIMORE, R.N.
AND BARBARA DEASY, R.N., BEING NURSES EMPLOYED BY
MEMORIAL HOSPITAL IN THE EMERGENCY DEPARTMENT,
JANE DOE, ALSO BEING A NURSE EMPLOYED BY MEMORI-
AL HOSPITAL IN THE EMERGENCY DEPARTMENT, DEFEN-
DANTS, SOUTH JERSEY EMERGENCY PHYSICIANS P.A., A
PROFESSIONAL ASSOCIATION, AND DR. PATTI BROWN, IN-
DIVIDUALLY AND AS AN EMPLOYEE OF SOUTH JERSEY
EMERGENCY PHYSICIANS, P.A., JOINTLY, SEVERALLY AND
IN THE ALTERNATIVE, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued February 20, 1997—Decided April 1, 1997.

Shebell, P.J.A.D., issued concurring and dissenting opinion.

Before Judges SHEBELL, BAIME and P.G. LEVY.

*Jeffry A. Mintz* argued the cause for appellant.

*Timothy P. O'Brien* argued the cause for respondents (*Paarz, Master, Koernig, Crammer, O'Brien & Bishop,* attorneys; *Mary Ann C. O'Brien,* on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

Plaintiff Geraldine Greene, individually and as administratrix of the estate of her deceased daughter Willyonna Greene, appeals from a judgment entered at the conclusion of her case dismissing her claims for medical malpractice and negligent infliction of emotional distress against defendants Dr. Patti Brown and South Jersey Emergency Physicians, P.A. Although numerous issues are presented, the principal question is whether a parent who witnesses acts of medical malpractice in the treatment of her child may maintain a claim for negligent infliction of emotional distress where she cannot prove that the doctor's negligence proximately caused the child's death or serious injury. We hold that she may not and affirm the Law Division's judgment.

## I.

Plaintiff brought this action against Memorial Hospital of Burlington County, three registered nurses employed in the hospital's emergency department, South Jersey Emergency Physicians—a professional association that had contracted with the hospital to perform emergency room services, and Dr. Patti Brown—a mem-

ber of the association. Plaintiff settled with the hospital and its employee nurses, and the trial proceeded with the remaining defendants.

On February 4, 1991, ten year old Willyonna returned home from school complaining of chest pains and tiredness. After giving Willyonna a light supper, plaintiff assisted the child to her bedroom where she immediately fell asleep. Plaintiff noticed that Willyonna's breathing was shallow and appeared abnormal. Concerned by Willyonna's listlessness, plaintiff decided to take the child to the hospital.

Upon arriving at the emergency department at 10:23 p.m., plaintiff told the clerk at the desk that Willyonna was experiencing chest pain and had difficulty breathing. Four minutes later, at 10:27 p.m., the triage nurse, Donna Blickle, took Willyonna's vital signs, including her temperature, blood pressure, pulse and respiratory rates. Willyonna had a pulse rate of 101 and a respiratory rate of forty, which Blickle recorded on Willyonna's chart. Willyonna told Blickle that she started experiencing chest pain while walking home from school earlier that day and that the pain increased when she coughed or took a deep breath. Blickle noticed that Willyonna had a cough and was taking shallow breaths, but nevertheless told plaintiff and the child to sit in the waiting area.

Julie Fenimore, whose shift began at 11:15 p.m., was assigned the duties of both triage and charge nurse in the emergency department. Upon her arrival, Fenimore received a report from Blickle, who had completed her shift, respecting the status of the patients who were in the emergency department. Fenimore was informed by Blickle that Willyonna had chest pain and difficulty breathing. Fenimore reviewed Willyonna's chart and concluded that she was not in acute distress. The emergency department was very busy that night and Fenimore gave priority to the patients who appeared in need of immediate treatment.

Fenimore's first contact with Willyonna occurred at 12:15 a.m., when she took Willyonna's chart from the rack and called her

name. Plaintiff and Willyonna entered the triage booth and Fenimore took Willyonna's vital signs. At this point, Willyonna's pulse had increased to 170 and her respiratory rate was eighty. Fenimore, who recorded this information on Willyonna's chart, realized that these rates were higher than they had been when Willyonna first entered the emergency department. Fenimore noted that Willyonna was taking shallow, rapid breaths. However, when Fenimore told Willyonna to relax and count her breaths in order to slow her breathing, Willyonna was able to do so. Thus, Fenimore felt that Willyonna was hyperventilating due to anxiety and was not in acute distress. Fenimore also noted that Willyonna's skin was warm and dry, and that she was oriented. Willyonna told Fenimore that she had pain on inspiration and felt "bad."

At this point, Fenimore escorted plaintiff and Willyonna to an examining room in the rear of the emergency department. Willyonna was weighed and instructed to undress and change into a hospital gown. Fenimore then listened to Willyonna's lungs with a stethoscope and found that they were clear "bilaterally in all fields."

At approximately 12:30 or 12:35 a.m., Fenimore informed Brown that Willyonna had a rapid respiratory rate and that her vital signs had changed. Although Fenimore initially testified that she showed Willyonna's chart to Brown, she later claimed that she could not recall whether she had done so. In any event, Fenimore told Brown that she thought Willyonna was hyperventilating and asked Brown for authorization to give Willyonna a paper bag in which to breathe in order to alleviate this condition. Brown authorized this procedure without examining the child.

Fenimore returned to Willyonna and gave her a brown paper bag. After demonstrating how to use the bag, Fenimore instructed plaintiff that Willyonna was to breathe into the container until she felt calmer and her respiratory rate had decreased. She also told plaintiff that she had "informed" Brown of the child's condition and that the physician would examine her as soon as possible.

Fenimore instructed plaintiff to summon one of the nurses if there was any change in Willyonna's condition.

After Fenimore left the examining room, Willyonna breathed through the paper bag for a time but then stopped, complaining that she was tired. While they were waiting in the examining room, Willyonna dozed sporadically. Plaintiff noticed that Willyonna continued to breathe in an abnormal manner. Plaintiff peered from the room and observed Brown, whom she recognized from a prior visit to the emergency department. Specifically, she saw Brown take a chart from the board, sit at a desk and begin eating.

At approximately 1:00 A.M., plaintiff turned to Willyonna and observed her suffer a seizure. At trial plaintiff testified that she immediately suspected that her daughter's condition had deteriorated because of Brown's inattention. She screamed for help. Brown, Fenimore, and other emergency personnel arrived on the scene. Oxygen was immediately applied since Willyonna was having respiratory difficulty and copious amounts of frothing sputum were pouring from her mouth and nose. Plaintiff was ushered from the room and sat on a nearby chair while emergency personnel attended Willyonna. Plaintiff then heard them call "respiratory stat code blue" and recognized that Willyonna was in distress. At that point, Brown exited the room and told plaintiff that Willyonna had a "little seizure" and that they were going to move her. Brown accompanied Willyonna as she was moved to another room. Plaintiff went to the family room and remained there while Willyonna was treated.

Willyonna was not breathing and had no pulse. The child was intubated, placed on an IV and cardiac monitor, given various medication, CPR and heart massage, but she never resumed spontaneous breathing and did not regain a pulse. Willyonna was pronounced dead at 1:55 a.m.

Brown approached plaintiff, who was seated in the family room, and informed her that Willyonna had expired. Plaintiff, who

related Willyonna's death to the lack of treatment, was near hysteria. She viewed the body later that night.

A subsequent autopsy disclosed that the cause of death was acute pulmonary edema and congestion due to acute viral myocarditis. Acute myocarditis is an inflammation of the heart that has a sudden onset. When the heart muscle becomes inflamed, it cannot pump efficiently and fluid backs up in all of the body's organs causing congestion and poor performance. Pulmonary edema is fluid in the lung spaces which prevents adequate oxygen transfusing from the bronchial tree into the blood stream.

Dr. Bruce Phillips, a physician board certified in emergency medicine, testified on behalf of the plaintiff. Phillips concluded that the triage nurses were negligent in failing to direct Willyonna to a physician for immediate examination. The witness noted that a patient complaining of chest pains and experiencing breathing difficulties and elevated pulse should be evaluated immediately by a physician. Phillips testified that Fenimore was particularly at fault because she took no action even after she knew that Willyonna's vital signs had significantly deteriorated.

Phillips further concluded that Brown deviated from accepted standards by failing to examine Willyonna after being apprised that the patient's vital signs had changed and that her respiratory rate had increased. According to the witness, Willyonna should have been placed on a heart monitor and oxygen administered. Phillips further found fault in Brown's authorization to use the bag to alleviate the child's rapid breathing, noting that the procedure employed deprived the patient of oxygen.

Phillips' testimony respecting proximate cause was highly equivocal. The witness acknowledged his inability to state with a reasonable degree of medical certainty that the child would have survived had appropriate treatment been administered, or that Brown's negligence constituted a substantial factor in the patient's death. While noting that appropriate measures might "have afforded the child a ... higher percentage of survival potential," Phillips candidly observed that he could "not say ... that [such

procedures] would have altered the outcome." Although Phillips suggested that the failure to implement appropriate "modalities ... contribute[d] to the patient['s] decrease in survivability," he later explained that this was only a "possibility" and that the corrective procedures he had recommended would have provided only a "slight margin" of impact.

It is against this factual backdrop that the trial court granted defendant's motion for judgment at the conclusion of plaintiff's case. The trial court concluded that no medical evidence had been presented from which a jury could reasonably find that defendant's negligence increased the risk of harm caused by Willyonna's preexisting condition or that such increased risk constituted a substantial factor in producing the ultimate result. As to the claim for negligent infliction of emotional distress, the trial court found no evidence that plaintiff actually observed the acts of malpractice or associated Willyonna's deteriorating condition with defendant's negligence.

## II.

We first address plaintiff's argument that the trial court erred by refusing to submit the question of proximate cause to the jury. We are in complete accord with the trial court's conclusion that plaintiff's evidence was insufficient to establish proximate cause. In reaching this result, we recognize the low threshold for determining the adequacy of plaintiff's evidence. Specifically, the trial court must accept as true all the evidence which supports plaintiff's claim and must accord her the benefit of all legitimate inferences flowing from the proofs presented. *See Lanzet v. Greenberg*, 126 *N.J.* 168, 174, 594 *A.*2d 1309 (1991); *Dolson v. Anastasia*, 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969); *R.* 4:40–1. Applying that somewhat "mechanical" standard, *Dolson v. Anastasia*, 55 *N.J.* at 5, 258 *A.*2d 706, we agree with the trial court that reasonable minds could not differ and that the element of proximate cause was not established.

A modified standard of proximate causation governs actions in which a doctor's alleged malpractice has combined with a preexisting condition to cause harm. *Scafidi v. Seiler*, 119 *N.J.* 93, 108, 574 *A.*2d 398 (1990); *Ginsberg v. St. Michael's Hosp.*, 292 *N.J.Super.* 21, 29–30, 678 *A.*2d 271 (App.Div.1996); *Gardner v. Pawliw*, 285 *N.J.Super.* 113, 120, 666 *A.*2d 592 (App.Div.1995), *certif. granted*, 146 *N.J.* 496, 683 *A.*2d 199 (1996). In such cases, "[e]vidence demonstrating within a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a preexistent condition raises a jury question whether the increased risk was a substantial factor in producing the ultimate result." *Scafidi v. Seiler*, 119 *N.J.* at 108, 574 *A.*2d 398; *see also Anderson v. Picciotti*, 144 *N.J.* 195, 210, 676 *A.*2d 127 (1996); *Roses v. Feldman*, 257 *N.J.Super.* 214, 217–18, 608 *A.*2d 383 (App.Div.1992); *Dubak v. Burdette Tomlin Memorial Hosp.*, 233 *N.J.Super.* 441, 450–51, 559 *A.*2d 424 (App.Div.), *certif. denied*, 117 *N.J.* 48, 563 *A.*2d 817 (1989). This modified standard of causation, which was first adopted by our Supreme Court in *Evers v. Dollinger*, 95 *N.J.* 399, 417, 471 *A.*2d 405 (1984), requires a plaintiff to demonstrate, within a reasonable degree of medical probability, that the delay resulting from the defendant's failure to have made an accurate diagnosis and to have rendered proper treatment increased the risk of harm from a preexisting condition and that such increased risk was a substantial factor in producing the ultimate result. *Anderson v. Picciotti*, 144 *N.J.* at 210, 212, 676 *A.*2d 127. The "substantial factor" test requires that the physician's deviation, in the context of the preexisting condition, was sufficiently significant in relation to the eventual harm as to satisfy the requirement of proximate cause. *Lanzet v. Greenberg*, 126 *N.J.* at 189, 594 *A.*2d 1309; *Scafidi v. Seiler*, 119 *N.J.* at 109, 574 *A.*2d 398; *Olah v. Slobodian*, 119 *N.J.* 119, 133, 574 *A.*2d 411 (1990); *Battenfeld v. Gregory*, 247 *N.J.Super.* 538, 549, 589 *A.*2d 1059 (App.Div.1991). A plaintiff relying on the modified standard of proximate causation bears the burden of proving both that the defendant's negligent treatment increased the risk of harm posed by the preexisting condition and that the increased risk was a

substantial factor in producing the ultimate result. *Anderson v. Picciotti*, 144 *N.J.* at 206, 676 *A.2d* 127.

Within this analytical framework, we conclude that plaintiff failed to produce evidence which would permit a jury to find, as a matter of reasonable medical probability, that Brown's negligence increased Willyonna's risk of harm from her preexisting myocarditis. Plaintiff's expert witness was unable to say that Brown's negligence resulted in a lost chance of survival, or that it enhanced the risk caused by the preexisting condition. Although the witness suggested the possibility that appropriate measures might have afforded a "slight margin" of "survivability," he was steadfast in his refusal to say, within a reasonable degree of medical probability, that defendant's negligence enhanced the risk of harm presented by Willyonna's downward course. Moreover, despite repeated urging by plaintiff's counsel, Phillips did not express the opinion that the risk of harm caused by Brown's deviation constituted a substantial factor in producing the ultimate result. In sum, the trial court correctly dismissed plaintiff's claim for medical malpractice because she failed to satisfy either prong of the two-part standard of proximate causation. *See Gardner v. Pawliw*, 285 *N.J.Super.* at 125, 666 *A.2d* 592.

## III.

We next consider plaintiff's argument that the trial court erred when it dismissed her claim for negligent infliction of emotional distress. We reject this contention.

*Portee v. Jaffee*, 84 *N.J.* 88, 417 *A.2d* 521 (1980) is the seminal decision permitting recovery for negligent infliction of emotional distress by a claimant who witnesses tortious conduct resulting in injury to a family member. There, a mother claimed damages for emotional distress arising out of her observation of the suffering and death of her child who was trapped and mortally injured in an elevator accident due to the negligence of her landlords and the servicing elevator companies. *Id.* at 90–91, 417 *A.2d* 521. Our Supreme Court established four elements for a claim of negligent

infliction of emotional distress: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Id.* at 101, 417 *A.*2d 521.

In *Frame v. Kothari*, 115 *N.J.* 638, 560 *A.*2d 675 (1989), the Court applied the standards enunciated in *Portee* in the context of medical malpractice arising out of a physician's misdiagnosis. The Court held that "[i]n an appropriate case, if a family member witnesses the physician's malpractice, observes the effect of the malpractice on the patient, and immediately connects the malpractice with the injury, that may be sufficient to allow recovery for the family member's emotional distress." *Id.* at 649, 560 *A.*2d 675. *See also Carey v. Lovett*, 132 *N.J.* 44, 58, 622 *A.*2d 1279 (1993) (in claims for negligent infliction of emotional distress arising in the medical malpractice context, claimant must observe contemporaneously the act of malpractice and the resultant injury).

The Court reiterated these principles in *Gendek v. Poblete*, 139 *N.J.* 291, 300, 654 *A.*2d 970 (1995). Citing *Frame*, the Court held that a claim for emotional distress must be based on evidence demonstrating the victim was "(1) a marital or intimate family member of the claimant, and that the claimant (2) witnessed the malpractice, and (3) immediately connected or associated the malpractice with the injury, and (4) as a result, suffered severe emotional distress." 139 *N.J.* at 300, 654 *A.*2d 970. The Court emphasized that "an immediate, close and clear involvement or connection [must] be present between a person suffering emotional distress and the conduct of the professional healthcare providers whose fault has contributed to the grave or fatal injuries of a related loved one." *Id.* at 302, 654 *A.*2d 970. The Court observed that a claim for negligent infliction of emotional distress is "narrowly circumscribed" in the context of a medical misdiagnosis or failure to act. *Ibid.*

Recently, the Court revisited this topic in *Ahn v. Kim*, 145 *N.J.* 423, 678 *A.*2d 1073 (1996). The Court explained that to recover for emotional distress resulting from medical malpractice on a family member, a claimant "must establish a close temporal connection between the malpractice and the injury to the patient as well as the contemporaneous observation of the injury by the claimant. In effect, the claimant must witness the malpractice and immediately connect it to the injury." *Id.* at 436, 678 *A.*2d 1073 (citations omitted). Moreover, the injury must be susceptible to immediate sensory perception and the claimant must observe the victim at the time of the injury, or immediately thereafter. *Ibid.*

In its attempt to apply these principles, the trial court concluded that plaintiff failed to demonstrate she actually observed defendant's malpractice and mentally associated it with the resulting harm to her daughter. Although the question is a close one, we believe that the trial court took too narrow a view of the evidence. Plaintiff testified that she observed defendant eating and browsing at a chart while the deteriorating condition of her daughter and the need to take emergency medical action became more urgent and apparent. Moreover, plaintiff testified in detail concerning her visual observations of Willyonna suffering a horrifying seizure which she immediately attributed to defendant's inaction. We recognize that a misdiagnosis normally does not create the kind of horrifying scene that is a prerequisite for recovery. *Frame v. Kothari*, 115 *N.J.* at 648, 560 *A.*2d 675. Our Supreme Court has thus said that "[r]arely will a member of the patient's family contemporaneously observe the immediate consequences of the defendant's misdiagnosis, and even more rarely will the results of the misdiagnosis be the injury or death of a loved one contemplated by the gruesome scene portrayed in *Portee*." *Id.* at 648, 560 *A.*2d 675. But here, plaintiff actually witnessed defendant's inaction and saw all too well a horrific outcome. While the facts of this case bear some resemblance with those in

*Frame* and *Gendek* where recovery was denied, we perceive these crucial differences.

Although we disagree with the trial court's reasoning in granting defendant's motion for judgment, we discern no basis to disturb the result reached. We come to the perplexing question noted at the outset of our opinion—may a claimant recover emotional distress damages where she witnesses the negligent treatment of a family member but cannot prove that the malpractice committed by the physician proximately caused death or serious injury. We are convinced that recovery should not be permitted in such a case. Our reasons are several.

Injury, disease and death are universal phenomena. Common experience teaches that the injury or death of a family member often produces severe emotional distress in another family member. The grief associated with watching a loved one die is no doubt all the more wrenching where there is reason to believe that death was avoidable had reasonable care been exercised by the attending physician. A threshold problem is thus "separating the grief that attends that distress when no one is at fault from the added stress attributable to the fact that the injury or death was produced by the negligent act of another." *Frame v. Kothari*, 115 *N.J.* at 642, 560 *A.*2d 675.

We are of the view that fault, in the sense of causing death or serious injury that would otherwise have been avoidable in the absence of negligence, is an indispensable element that must be proved in cases of this kind. We seek to limit recovery to "negligent conduct which strikes at the plaintiff's basic emotional security." *Id.* at 643, 560 *A.*2d 675 (quoting *Portee v. Jaffee*, 94 *N.J.* at 99, 462 *A.*2d 573). Because the death or serious injury of an intimate family member will always be expected to threaten one's emotional welfare, *ibid.*, such distress should not be compensable absent proof that the malpractice of the physician increased the risk of death or serious injury and that such increased risk constituted a substantial factor contributing to the ultimate result. Stated somewhat differently, it is the emotional distress associated

with the lost chance of survival caused by the physician's negligence that is compensable, and not the normal grief associated with witnessing the death or suffering of a loved one.

We perceive our task as drawing the boundaries of a claim that permits recovery for the added stress resulting from witnessing medical malpractice impacting upon the patient's lost chance of survival. Specifically, the rule we adopt is designed to compensate the claimant for the added stress caused by witnessing an act of malpractice causing harm to the patient. We are nonetheless sensitive to the fact that medical malpractice witnessed by a claimant might well add to the claimant's emotional distress even though it has not impacted on the patient's condition. We appreciate in full measure the pathos and genuineness of a plaintiff's suffering in such a case. But our Supreme Court has limited recovery to cases in which the plaintiff has "observe[d] the effect of the malpractice" on the patient. *Frame v. Kothari*, 115 *N.J.* at 649, 560 *A.*2d 675. And while we do not doubt the pain experienced by plaintiff in this matter, we would be remiss were we to see only the case before us. "Drawing lines . . . is the business of the courts, and lines must be drawn to provide remedies for wrongs without exposing wrongdoers to unlimited liability." *Id.* at 649, 560 *A.*2d 675.

## IV.

In light of our disposition of the principal issues, we need not address plaintiff's remaining arguments.

The judgment of the Law Division is affirmed.

SHEBELL, P.J.A.D., concurring in part and dissenting in part.

I am convinced that the emotional distress claim of the mother satisfies all of the requirements of our case law and that it was for the jury to determine whether or not there was proximate cause between Dr. Brown's negligence and the emotional distress inflicted on the mother. Defendant, Dr. Brown, was advised at approximately 12:30 a.m. that Willyonna Greene, the ten year old daugh-

ter of Geraldine, had developed a rapid respiratory rate and that her vital signs had dramatically worsened. In fact, the nurse related that she observed what she thought was hyperventilating by the daughter. It, therefore, is obvious that a reasonable jury may infer that the respiratory rate was so rapid as to be noticeable by a lay person.

Dr. Bruce Phillips, plaintiff's medical expert, made it clear that Dr. Brown deviated from accepted medical standards by failing to examine the young girl and that, if the doctor had conducted an examination, immediate action surely would have been taken to administer oxygen to the child. Dr. Brown, however, did the opposite and deprived the child of oxygen by approving the inappropriate procedure of having her breathe in a bag. Certainly, a jury could conclude that if the child had been given oxygen, the mother would not have suffered the emotional distress of having to observe her child, unable to breathe, continue to suffer from lack of oxygen while left unattended by a physician, who instead of assisting sat down and started eating.

This factual scenario, if accepted by the jury, clearly satisfies the "substantial factor" and "proximate causation" requirements of *Lanzet v. Greenberg*, 126 *N.J.* 168, 189, 594 *A.*2d 1309 (1991) and *Scafidi v. Seiler*, 119 *N.J.* 93, 108–09, 574 *A.*2d 398 (1990). It is beyond question that a mother who takes her young child to a medical facility where they are negligently denied medical services and where the child is subjected to a physician's malpractice may be significantly impacted by that malpractice, in fact, the mother may be so impacted that a reasonable jury may determine, based upon its common experience, that the mother would immediately connect the malpractice to the patient's continued suffering and distress, thereby satisfying the elements required for allowing the mother emotional distress damages. *See Frame v. Kothari*, 115 *N.J.* 638, 649, 560 *A.*2d 675 (1989).

There is no reason to assume that a jury cannot distinguish between the emotional distress caused by the mother's observation

of those events and the emotional distress caused by the death of the child, which in this case, I agree, was insufficiently connected by the expert to Dr. Brown's malpractice because of the almost inevitable fatal course of the illness. *See Gendek v. Poblete,* 139 *N.J.* 291, 300–03, 654 *A.*2d 970 (1995). In short, here, it does not follow that proof that the malpractice caused the child's death is an indispensable element of the mother's claim for emotional distress, as the majority appears to conclude.

Therefore, I concur with the majority opinion that the issue of proximate cause with respect to the wrongful death was properly withheld from the jury. However, I dissent with respect to its conclusion that, as a result of this shortcoming in the proofs, the mother's claim for emotional distress must fail.