**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5561-18

DOROTHY L. MOODY, by and
through her power of attorney,
DOROTHY GATEWOOD-
GABRIEL,

      Plaintiff-Respondent,

v.

THE VOORHEES CARE AND
REHABILITATION CENTER
and THE LAKEWOOD OF
VOORHEES OPERATOR, LLC,

      Defendants-Appellants,

and

GINA KIRCHOFF, administrator,

      Defendant.

_____

      Argued November 9, 2020 – Decided February 17, 2021

      Before Judges Fasciale and Rothstadt.

      On appeal from the Superior Court of New Jersey, Law
      Division, Camden County, Docket No. L-3643-16.

Susan J. Wall argued the cause for appellants (Gibley and McWilliams, PC, attorneys; Susan J. Wall, on the briefs).

Richard J. Talbot argued the cause for respondent (Law Office of Andrew A. Ballerini and Foley & Foley, attorneys; Richard J. Talbot, of counsel; Sherry L. Foley and Timothy J. Foley, on the brief).

Anthony Cocca argued the cause for amicus curiae New Jersey Defense Association (Cocca & Cutinello, LLP, attorneys; Anthony Cocca and Katelyn E. Cutinello, of counsel and on the brief).

PER CURIAM

Defendants the Voorhees Care and Rehabilitation Center and the Lakewood of Voorhees Operator, LLC[1] appeal from the Law Division's August 14, 2019 final judgment that awarded $349,687.45 to plaintiff Dorothy L. Moody, through her power of attorney, Dorothy Gatewood-Gabriel. The trial judge entered the judgment based upon a jury's determination that defendants were negligent in their care of plaintiff and that they violated the Nursing Home Responsibilities and Residents' Rights Act (NHA), N.J.S.A. 30:13-1 to -17. On appeal, defendants and amicus curiae, the New Jersey Defense Association (NJDA), argue that the trial judge improperly barred defendant's report and his

---

[1] As of April 9, 2019, defendant Gina Kirchoff, Administrator, was dismissed from the case.

testimony, that plaintiff's expert impermissibly testified about the NHA, was not qualified to testify as to a standard of care for nurses, and that it was improper for the trial judge to have denied defendants' motion for judgment notwithstanding the verdict (JNOV).[2]

Having considered defendant's and NJDA's arguments in light of the record and the applicable principles of law, we affirm as we conclude that defendants' expert's testimony was properly barred due to the untimely service of his report without explanation, and plaintiff's expert's testimony was properly admitted as the expert was qualified to present his opinions and he did not usurp the trial judge's responsibility to instruct the jury on the law. Finally, because defendants did not appeal from the denial of its JNOV motion, we have no reason to consider it on appeal.

---

[2] We decline to address NJDA's argument that the jury should not have been instructed as to defendants' noncompliance with 42 C.F.R. § 483.25 because this argument was not addressed by the parties, and "as a general rule, the [c]ourt 'does not consider arguments that have not been asserted by a party, and are raised for the first time by an amicus curaie.'" State in Interest of A.A., 240 N.J. 341, 359 n.1 (2020) (quoting State v. J.R., 227 N.J. 393, 421 (2017)).

I.

A.

The facts giving rise to plaintiff's claims are derived from the trial record and are summarized as follows. Plaintiff, who is eighty-nine years old, became a resident of defendants' nursing facility on February 13, 2014. Plaintiff entered the nursing facility due to her dementia and several medical issues, including diabetes.

On June 8, 2016, at approximately 8:00 p.m., Gloria Myers, a nurse at defendants' facility, administered a finger stick blood sugar test on plaintiff without a physician's order because plaintiff was "lethargic," "irritable," and had only eaten one quarter of her dinner. The test indicated a blood sugar count of 514.

The nurse then contacted a staff physician who ordered fast-acting insulin be administered immediately and a complete blood count to be conducted the following morning. According to the staff's records, after the insulin was given, plaintiff had "[n]o acute distress" and was "more alert," and she would continue to be monitored.

The next morning, another nurse, Teresa Higgins, observed that plaintiff was lethargic and "non-arousable by verbal and tactile stimuli." She did not

4

respond to a "sternal rub, was unable to take any of her medications, and did not eat breakfast." She noted that plaintiff had refused to cooperate with the blood draw scheduled for that morning. Higgins was concerned about plaintiff's blood sugar, but she did not perform a finger stick blood sugar test because "she did not have a physician's order . . . and . . . an order would be needed to obtain . . . [plaintiff's] blood glucose." Instead, Higgins contacted the physician who again ordered lab work on a stat basis to obtain plaintiff's blood sugar levels among other things. Higgins thereafter contacted the lab and relayed the physician's order. Eventually, the lab was able to obtain only one vial of blood.

During this time, plaintiff was unable to urinate and after two hours, nurses gave her water, ginger ale, "five scoops of mashed potatoes and . . . ice cream." By 3:00 p.m., plaintiff became even more lethargic.

At approximately 4:30 p.m., lab results were received that indicated that plaintiff's blood sugar was 672, her blood urea nitrogen was 58, and her sodium was 154. The lab rechecked to verify the high number, which was again confirmed.

During Higgins's shift she administered two blood sugar tests, which indicated plaintiff's blood sugar was 76, however, she could not recall when the tests were administered. She testified that she did not need a physician's order

A-5561-18

to check plaintiff's blood glucose at that point because the "circumstances [we]re different" from those of that morning when the physician had been "managing all of [plaintiff's] care." Higgins notified the doctor of plaintiff's lab results and he ordered that plaintiff be transferred to the hospital immediately.

Once at the hospital, plaintiff's blood sugar was tested and it indicated her blood sugar level was 840. Her blood urea nitrogen was still 58, her ketones measurement was 29.7, and her bicarbonate was low at 19. Plaintiff developed severe hyperglycemia, which was the cause of her blood sugar rising to over 800. In addition, plaintiff suffered from dehydration, ketoacidosis, hyperosmolar nonketosis, and hypokalemia.

Once her blood sugars stabilized, plaintiff was discharged on June 19, 2016. Although plaintiff still required treatment at a long-term care facility, she never returned to defendants' facility.

### B.

Plaintiff filed her complaint on October 7, 2016, alleging negligence and violations of the NHA and several federal regulations dealing with nursing homes under the Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4211, 101 Stat. 1330, 182, 182-221 (OBRA), codified under 42 C.F.R.

A-5561-18

§§ 483.1-483.480. Defendants filed their answer on February 13, 2017. Thereafter, the parties engaged in discovery.

The original discovery end date was April 14, 2018, which was then extended twice upon plaintiff's motions to extend the discovery end date such that the last discovery end date was October 31, 2018. Trial was scheduled for January 14, 2019, but in response to defendant's November 26, 2018 request, the trial judge relisted the trial first to February 11, 2019, and then to April 8, 2019.

More than four months after the discovery end date and after the first two trial dates passed, defendants served plaintiff with their expert's report on March 5, 2019, without amending their answers to interrogatories or explaining the reason for the late service as required by Rule 4:17-7. Plaintiff filed a motion to bar defendant's expert's report and his testimony. Defendants then filed a motion to bar plaintiff's medical expert from discussing alleged violations of the NHA. After considering the parties' oral arguments on April 9, 2019, the trial judge granted plaintiff's motion and reserved his decision on defendants', stating that he would make a final determination on the extent of plaintiff's medical expert's testimony when the expert testified and advising defendants to renew their objection during his testimony if they felt he was "going into some area that" they thought was "forbidden."

A-5561-18

Trial began the next day with defendants filing an in limine motion to again exclude plaintiff's expert's testimony. The following morning, the trial judge denied the motion and allowed plaintiff's expert to testify about the alleged violations of plaintiff's rights under the NHA.

The jury returned its verdict on April 16, 2019, awarding $125,000 on plaintiff's negligence claim and $100,000 on her NHA claim. The following week, defendants filed their JNOV motion, which the judge denied on May 10, 2019, after considering the parties' submissions and oral arguments.

Plaintiff thereafter filed an application for attorney's fees under the NHA. The trial judge granted the application and entered the final judgment in the amount of $349,687.45, which included attorney's fees and costs in the amount of $124,687.45. This appeal followed.

## II.

## A.

Defendants' and the NJDA's arguments focus on the trial judge's determinations about whether and to what extent the parties' experts could testify at trial, if at all. We review a trial judge's decision whether to bar a party's expert's testimony for an abuse of discretion. Townsend v. Pierre, 221 N.J. 36, 52 (2015). An "abuse of discretion only arises on demonstration of 'manifest

error or injustice,'" Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008) (quoting State v. Torres, 183 N.J. 554, 572 (2005)), and occurs when the trial judge's "decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

Applying that standard, we begin our review by addressing defendants' assertion that the trial judge improperly barred their expert from testifying. The expert report defendants served plaintiff on March 5, 2019 was from Dr. Richard G. Stefanacci and dated December 18, 2018. On March 8, 2019, the doctor issued a supplemental report that was also served on plaintiff.

In her motion to bar the doctor from testifying, plaintiff filed a supporting certification from her attorney that explained the facts leading up to defendants' service of Dr. Stefanacci's report just weeks before the third scheduled trial date. The certification stated that plaintiff's counsel had a conversation with defense counsel on November 20, 2018, during which plaintiff's counsel advised defense counsel of plaintiff's offer of judgment, his consent to defendant's request for an adjournment of the trial date, and his objection to any attempt to serve late expert reports. Plaintiff's counsel further explained that after trial was relisted for

February 2019, defense counsel never filed a motion to extend the discovery end date and never provided a certification of due diligence when counsel emailed the doctor's report. He stated that defendants' expert report was submitted four months after the October 2018 discovery end date, and the supplemental report was submitted only eighteen days before trial was to take place.

Defendants filed an opposing certification that did not dispute the fact that the report was untimely or that it was served without the required explanation for its delay. Instead, defendants argued there would be no prejudice by allowing in Dr. Stefanacci's report and testimony. By barring the report and testimony, defense counsel contended that defendants would have no defense and the case would not be heard on the merits.

As noted, after considering the parties' arguments, the trial judge granted plaintiff's motion. The judge cited to defendant's failure to comply with Rule 4:17-7 and the report being served months after the latest discovery end date without any explanation for the delay that would justify denying plaintiff's motion.

B.

On appeal, defendants and NJDA argue that the trial judge erred in granting plaintiff's motion because the exclusion of Stefanacci's testimony prevented the

case from being heard on its merits and the judge's strict reliance on the Court Rules created an injustice, especially since its admission would not have caused any prejudice to plaintiff. According to defendants, as trial was still a few weeks away and their expert was available to be deposed, plaintiff had adequate time to address the expert's report in anticipation of trial. Defendants further contend that plaintiff's motion to bar the expert's report and testimony was untimely and was equivalent to a summary judgment motion, which must be filed at a minimum of thirty days prior to trial. Last, defendants contend that the judge imposed too harsh a sanction, which is contrary to case law, and other sanctions should have been considered. We disagree.

It is beyond cavil that a trial judge can, in the exercise of his or her discretion, fix the date upon which expert reports must be served. Casino Reinvestment Dev. Auth. v. Lustgarten, 332 N.J. Super. 472, 488 (App. Div. 2000). Moreover, equally true is that our Court Rules expressly provide for the extension of the discovery end date to allow for the late filing of expert reports or completion of other discovery where a motion to extend discovery has been filed prior to the close of discovery. Under Rule 4:24-1(c), on "good cause shown," discovery extensions are granted where there is no scheduled trial or arbitration date and no showing of prejudice to the other party. Leitner v. Toms

11

River Reg'l Schs., 392 N.J. Super. 80, 93 (App. Div. 2007); Ponden v. Ponden, 374 N.J. Super. 1, 9-11 (App. Div. 2004). Where a trial date is fixed, an extension can be obtained upon a showing of "exceptional circumstances." R. 4:24-1(c).

Similarly, our Rules allow for an amendment to answers to interrogatories that is necessary to identify an expert and provide his or her report. R. 4:17-7. However, where the amendment is made after "the end of the discovery period, as fixed by the track assignment or subsequent order," the party serving the amendment must "certif[y] . . . that the information requiring the amendment was not reasonably available or discoverable by the exercise of due diligence prior to the discovery end date. In the absence of said certification, the late amendment shall be disregarded by the court and adverse parties." Ibid. Disregarding the late report is required without any showing of prejudice by the opposing party. See Ponden, 374 N.J. Super. at 8-9.

Despite these requirements, defendants took absolutely no steps toward seeking the judge's permission to allow for an extension of discovery, nor did they make any showing of good cause or exceptional circumstances or provide any explanation by certification or otherwise as to why their expert's report was filed months after the close of discovery.

Under these circumstances, we conclude that the trial judge properly exercised his discretion by barring defendants' expert's report and testimony. While cases should always be determined on the merits where possible, defendants undermined that possibility by completely disregarding the Court Rules. Any injustice that occurred here was simply defendants' own creation.

We are not persuaded otherwise by defendants' additional argument that plaintiff's in limine motion was barred by our holding in Cho v. Trinitas Regional Medical Center, 443 N.J. Super. 461, 471 (App. Div. 2015) because the motion was a dispositive motion that should have been brought under Rule 4:46-1 as a summary judgment motion. We note initially that defendants did not raise this issue before the trial court, and an appellate court will generally decline to address issues that the trial court did not have the opportunity to address. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973); Correa v. Grossi, 458 N.J. Super. 571, 576 n.2 (App. Div. 2019). Even were we to consider the argument, defendants' contention has no merit. Plaintiff's motion was not based upon the merits of the claim, or upon defendants' expert's qualifications or any deficiency in his report.[3] Rather, it arose at the last minute

---

[3] Effective September 1, 2020, after the trial in this matter, our rules were amended to add Rule 4:25-8 to address motions in limine, which are "defined as

because of defendants' conduct, and it sought relief for a discovery violation. Such motions are expressly provided for by our Court Rules. See R. 4:23-5(b) ("The court at trial may exclude the testimony of a[n] . . . expert whose report is not furnished pursuant to [Rule] 4:17-4(a) to the party demanding the same."). The judge's determination was supported by the Court Rules and not inconsistent with Cho.

## III.

Next, we address defendants' argument that the trial judge abused his discretion by denying their motion to bar plaintiff's expert, Dr. John Kirby, from testifying about violations of the NHA. Again, we find no abuse of discretion.

## A.

During discovery, plaintiff served defendants with Dr. Kirby's report. Although the report primarily focused upon defendants' staff's failure to properly monitor plaintiff's sugar level and to timely contact a physician and get her to a hospital sooner, it also included a discussion of the relevant federal and

---

an application returnable at trial for a ruling regarding the conduct of the trial, including admissibility of evidence, which motion, if granted, would not have a dispositive impact on a litigant's case." By the Rule's express terms, in limine motions do not include "an application to bar an expert's testimony in a matter in which such testimony is required as a matter of law to sustain a party's burden of proof."

state statutes and regulations. As part of that discussion, the report described and quoted from N.J.S.A. 30:13-5(j) of the NHA as

> specif[ying] a patient's "right to a safe and decent living environment and considerate and respectful care that recognizes the dignity and individuality of the resident, including the right to expect and receive appropriate assessment, management and treatment of pain as an integral component of that person's care consistent with sound nursing and medical practices."

The report also stated that this section of the NHA "required that nursing facilities recognize the dignity of residents. The failure of [defendants] to monitor [plaintiff's] blood sugar appropriately was a failure to provide a safe and decent living environment that recognized and upheld [plaintiff's] dignity and individuality."

In their motion to bar Dr. Kirby from testifying, defendants argued that Dr. Kirby could not testify about whether defendants' actions were a violation of plaintiff's dignity under the NHA in N.J.S.A. 30:13-5(j).

The trial judge initially held that he was "going to permit Dr. Kirby to say that not checking the blood sugars over a period of [twenty] hours . . . did not afford the dignity that the statute requires." Relying on Ptaszynski v. Atlantic Health Sys., 440 N.J. Super. 24 (App. Div. 2015), defendants later argued that the testimony was not allowed as an "expert can't give extra weight to a statute

A-5561-18

by testifying as to what dignity is," as that would be usurping the role of the judge to give instructions on law to the jury. The judge found that Ptaszynski only prohibited an expert from providing an opinion on the meaning of "dignity," as also conceded by plaintiff, who agreed that the expert could not give definitions of words in a statute, but the expert was allowed to testify as to whether defendants' actions violated the statute.

Before ruling with finality, the judge informed defendants that if they could find any case law that focused specifically on this issue, he would consider it the next morning. Although there is no record that defendants ever produced any case law, the next morning, defendants requested a Rule 104 hearing to determine the extent of Dr. Kirby's testimony, which the judge would not allow as it was too late.

The judge further indicated that he was inclined to allow Dr. Kirby to testify about whether defendants' actions violated the statute but would consider any objections as Dr. Kirby's testimony went on. Defendants made a "standing objection in terms of [Dr. Kirby's] testimony . . . pursuant to [their] motions in limine and also [their] request for a Rule 104 hearing."

16

During his testimony, Dr. Kirby,[4] who the judge determined was qualified as an expert in internal medicine and geriatrics and was called as an expert as to defendants' negligence and violation of the statutes, explained that he was familiar with federal and state statutes and regulations, including the NHA, as he "need[ed] to know what sort of the broad brush standard of care is [as] a physician's work and a nurse's work will fall under those regulations." After testifying in detail as to why he believed that defendants' staff deviated from the applicable standard of care, which caused harm to plaintiff, Dr. Kirby addressed the NHA and stated that plaintiff's "rights as a nursing home resident were violated," specifically "her rights to a safe and decent living environment," "her right to care that recognized her dignity," and "her right to care that recognized her individuality." On cross-examination, when defense counsel asked the doctor about the meaning of "dignity" under the NHA, plaintiff's attorney objected. The trial judge overruled the objection, but defense counsel decided not to pursue an answer to the question.

---

[4] Plaintiff also presented testimony from a different expert, Nurse White, as to the nurses' breach of the applicable standard of care. The trial judge ruled that the nurse expert could testify as to the negligence claim, but not as to plaintiff's violation of NHA rights claim.

A-5561-18

During his charge to the jury, the judge instructed the jury as to their right to accept or reject any expert's opinions and that it had to accept the judge's instructions as to the law. The trial judge instructed the jury as to the NHA as follows:[5]

> The plaintiff . . . asserts that the defendant violated NJSA 30:13-5(j) which states, "Every resident of a nursing home shall have the right to a safe and decent living environment and considerate and respectful care that recognizes the dignity and individuality of the resident."

> If you find that the defendant has violated any of these statutes, you have found a violation of the New Jersey Nursing Home Responsibilities and Residents Rights Act and a violation of Dorothy L. Moody's rights. You are not, however, simply to duplicate damages for the negligence claims.

> Evidence of violations. The plaintiff alleges that the defendant violated various laws under the federal regulations and the New Jersey Nursing Home Responsibilities and Residents Rights Act. The plaintiff also alleges that the defendant violated NJSA 30:13-5, Nursing Home Responsibilities and Rights of Residents, including paragraph j of that statute which states that nursing home residents "have the right to a safe and decent living environment and considerate and

---

[5] Defendants insisted that specific language from <u>Ptaszynski</u> be added to the charge. The judge granted defendants' request, modifying the charge and verdict sheet to include the language, "You, the jury, cannot award the plaintiff damages for the defendant's violations of the Nursing Home Act and its negligence based upon the same injuries or harm to [plaintiff]."

respectful care that recognizes the dignity and individuality of the resident."

In support of the claims of violation of rights, the plaintiff alleges violation of federal law under the code of federal regulations. One federal regulation, for example, that the plaintiff has claimed was violated is that of 42 CFR Section 483.25, Quality of Care. That regulation states that, "Each resident[] must receive and the facility might [sic] provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being consistent with the resident's comprehensive assessment and plan of care."

The statutes and regulations in question set up standards of conduct for nursing homes. If you find that the defendant has violated any nursing home law which caused harm to Ms. Moody, the defendant violated the plaintiff's nursing home rights.

As to damages, the judge instructed that if the jury found a violation under the NHA, they were not to "simply . . . duplicate damages for the negligence claims." He explained that the jury could not "award . . . plaintiff damages for . . . defendant[s'] violations of the [NHA] and its negligence based upon the same injuries or harm to [plaintiff]." Consistent with that instruction and defendants' request, the verdict sheet separated the negligence claim from the NHA claim. The jury found defendants were negligent and violated the NHA, and made separate awards for each claim, in different amounts.

B.

On appeal, relying on Ptaszynski, defendants contend that it was improper for the trial judge to allow "Dr. Kirby to provide opinion testimony interpreting a pertinent section of the NHA," after they objected to the testimony. Specifically, defendants argue that plaintiff's expert should not have been allowed to testify about "dignity," "safe and decent living environment," and "individuality." They contend that Dr. Kirby usurped the responsibility of the judge to instruct the jury on the law by discussing the NHA. We disagree.

The NHA "was enacted in 1976 to declare 'a bill of rights' for nursing home residents and define the 'responsibilities' of nursing homes." Ptaszynski, 440 N.J. Super. at 32. The patient's "rights" are enumerated in N.J.S.A. 30:13-5(a) to (n). The nursing home's "responsibilities" are enumerated in N.J.S.A. 30:13-3(a) to (j). Under N.J.S.A. 30:13-8(a), a person can only bring an action for violation of one of the enumerated residents' "rights," set forth in N.J.S.A. 30:13-5. Ptaszynski, 440 N.J. Super. at 33-36.

While there are several rights enumerated under the act, in relevant part, N.J.S.A. 30:13-5(j) specifically states:

> Every resident of a nursing home shall . . . [h]ave the right to a safe and decent living environment and considerate and respectful care that recognizes the dignity and individuality of the resident, including the

20

right to expect and receive appropriate assessment, management and treatment of pain as an integral component of that person's care consistent with sound nursing and medical practices.

In discussing these rights in Ptaszynski, we determined that expert testimony would generally not be allowed on domestic law. 440 N.J. Super. at 38. For that reason, we found the trial judge "erred by permitting [the expert] to testify extensively as an expert in 'nursing law'" and "to provide her opinion of the meaning of the word 'dignity' in N.J.S.A. 30:13-5(j)" without the judge "provid[ing] any guidance to the jury," other than telling "the jury that it was not bound by the testimony of an expert, . . . [and] merely read[ing] N.J.S.A. 30:13-5(j) to the jurors." Id. at 37. By doing so, we found "the jury was left with only [the expert's] interpretation of the statute to guide its deliberations." Ibid.

We also observed that "the trial judge has the exclusive responsibility to instruct the jury on the law to be applied to avoid the 'danger . . . that the jury may think that the expert in the particular branch of the law knows more than the judge[.]'" Ibid. (alteration and omission in original) (quoting State v. Grimes, 235 N.J. Super. 75, 80 (App. Div. 1989)). However, we made clear that while the expert was allowed to cite to specific laws "as support for her opinions on the applicable standard of care," she was not able to testify "extensively as

21

an expert in 'nursing law.'" Ibid. To that end, we held "[t]he judge . . . erred because he permitted [the expert] to provide her opinion of the meaning of the word 'dignity' in N.J.S.A. 30:13-5(j)." Ibid. We also concluded that the judge failed to properly instruct the jury as to their being required to "allocate[] the damages to the separate claims, based on the different theories of liability being asserted." Id. at 40.

Here, the testimony of Dr. Kirby involving the NHA did not contravene our holding in Ptaszynski. Dr. Kirby was not qualified as an expert in nursing home law or any law. Rather he was questioned extensively about his professional experience and familiarity with nursing home procedures and was found to be "qualif[ied] as an expert in internal medicine and geriatrics." Moreover, he never defined "dignity" or any other words in the NHA.

Dr. Kirby only confirmed that he believed plaintiff's rights under the NHA to "a safe and decent living environment," "to care that recognized her dignity," and her "right to care that recognized her individuality" were violated. It was defense counsel who attempted to question Dr. Kirby on the meaning of "dignity," but after the trial judge overruled plaintiff's objection to the question, defense counsel thought better not to ask. There were no definitions given by the doctor, as there were in Ptaszynski, that could have misled the jurors from

22

applying the plain meaning of the act's language as instructed by the trial judge. And, the jury was properly instructed that they could not award plaintiff damages for defendants' violation of the NHA and its negligence based on the same injuries, unlike in Ptaszynski. Permitting Dr. Kirby to testify as he did was not an abuse of discretion.

IV.

We turn to defendants' argument that the judge erred in allowing Dr. Kirby to testify beyond his expertise. According to defendants and the NJDA, as a doctor, Dr. Kirby was not in a position to discuss the expertise, training of nurses, and the nursing standards of care. They contend that this contradicted the judge's prior ruling that barred Dr. Kirby from testifying about the nurses' standards of care. We disagree.

A.

While testifying to his qualifications at trial, Dr. Kirby explained that not only was he a physician, but he also specialized in geriatric medicine and had experience in working "in long-term care facilities [where he took] care of patients . . . who [were] undergoing rehabilitation after an acute illness." During his career, he had privileges at three different nursing homes and was a former medical director at two nursing homes. Dr. Kirby testified that seventy percent

23

of his "patients [fell] into the geriatric age category, age [sixty-five] and older." He indicated that he had "been working intimately with nurses . . . for over [thirty] years." He also described his familiarity with federal and state laws and regulations that apply to nursing homes that was based upon his work in nursing homes being subject to those standards. However, he never had an "administration license" for nursing, he was not part of any nursing professional association, and he never worked as a nurse.

After being qualified by the judge, Dr. Kirby testified in detail about plaintiff's medical conditions, the test results, and her need for specific treatment. According to Dr. Kirby, if the nurses would have rechecked plaintiff's blood sugar anywhere from one to four hours after the original check, they would have been aware of plaintiff's rising blood sugar and would have been able to treat it with further insulin, without having to go to the hospital.

Dr. Kirby also explained that no physician's order would be needed to administer a blood sugar test. He described a sternal rub as a maneuver that was "very, very painful" and plaintiff's failure to respond to it demonstrated how serious her condition was at the time. Dr. Kirby found that plaintiff's lethargy and her inability to eat or urinate from the morning to early afternoon of June 9, 2016, was consistent with dehydration due to high blood sugar. He stated that

it made no sense why the nurses would have given "her ginger ale and . . . ice cream" and analogized the act to "taking gasoline and throwing it on a fire." In general, if sugar-free drinks and food were given, Dr. Kirby explained that most nurses would note that in their documentation.

He further explained that plaintiff's high blood urea nitrogen verified that plaintiff was dehydrated. It also did not make sense to him that the blood sugar test conducted by the nurses on June 9, 2016, would only be 76, when the lab results stated 672 and he observed that this likely "indicate[d] a malfunction of the glucose meter." The ketones that tests identified in plaintiff's blood when she was in the hospital were a further consequence of high blood sugar.

On cross-examination, Dr. Kirby stated it was an impossibility for plaintiff's blood sugar to go from 672 to 76 and back up to 840. Even though a physician's note did not tell the nurses to continuously check plaintiff's blood sugar, he stated that most nurses he worked with would logically conduct a blood sugar test with plaintiff's high numbers.

## B.

"To prove medical malpractice, ordinarily, 'a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury.'"

25                                                    A-5561-18

Nicholas v. Mynster, 213 N.J. 463, 478 (2013) (quoting Gardner v. Pawliw, 150 N.J. 359, 375 (1997)).  Where the claim is against a nurse,

> in the hierarchal setting of a multi-disciplinary medical team providing care to a [nursing home] patient, . . . [t]o assess a deviation in the standard of care in such a setting, one must know the procedures, protocols, and scope of duties of the licensed professional nurses in such circumstances.  An expert is required for that explanation.  Such information is outside of the realm of common knowledge.
>
> [Cowley v. Virtua Health Sys., 242 N.J. 1, 20 (2020).]

As to nursing homes, the NHA established standards of care for the treatment of such facilities' residents.  Estate of Ruszala ex rel. Mizerak v. Brookdale Living Cmtys., Inc., 415 N.J. Super. 272, 293 (App. Div. 2010).  The breach of those standards also requires expert explanation as the subject matter is beyond the "ken of the average juror."  Townsend, 221 N.J. at 55 (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 582 (2008)).

A witness qualifies "as an expert by knowledge, skill, experience, training, or education."  N.J.R.E. 702. "[E]xpert testimony must meet three basic requirements" for admissibility:  "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended

testimony." Polzo, 196 N.J. at 582 (quoting State v. Townsend, 186 N.J. 473, 491 (2006)). A "trial court has discretion in determining the sufficiency of the expert's qualifications and [its decision] will be reviewed only for manifest error and injustice." Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 68 (2019) (quoting Torres, 183 N.J. at 572).

Here, plaintiff produced two experts: Nurse White as to the nurses' standard of care, and Dr. Kirby as to the nursing home's standard under the NHA. Moreover, the trial judge specifically ruled that neither could testify as to the other's profession's standard. As the judge stated, "nurses testify about nurses" and "doctors testify about doctors." Dr. Kirby never testified to the expertise, training of nurses, or the nursing standards of care. However, because both experts by necessity had to address the treatment of plaintiff while at the nursing home and by definition, under the nurses' care, there was a natural overlap between their testimonies when addressing why they believed that the nurses and the nursing home violated their respective standards of care. The discussions about plaintiff's treatment in that context did not breach the required separation of their testimony about their specific areas of expertise.

V.

Finally, we address defendants' contention that the trial judge erred by denying their motion for JNOV. However, as noted we cannot review the judge's order because defendants did not include in their notice of appeal the judge's May 10, 2019 order denying their motion, nor did they mention it in their appellate case information statement.[6] They also never provided us with a transcript from oral argument or with the judge's decision.

Under these circumstances we are constrained to not consider their appeal from that order. See R. 2:5-1(e)(3)(i) (stating that a notice of appeal "shall designate the judgment, decision, action or rule, or part thereof appealed from"); Fusco v. Bd. of Educ., 349 N.J. Super. 455, 461-62 (App. Div. 2002) (stating that appellate review pertains only to judgments or orders specified in the notice of appeal); Sikes v. Twp. of Rockaway, 269 N.J. Super. 463, 465-66 (App. Div.) (holding that an issue raised in a brief but not designated in the notice of appeal was not properly before the court), aff'd o.b., 138 N.J. 41 (1994). See also Silviera-Francisco v. Bd. of Educ. of Elizabeth, 224 N.J. 126, 142 (2016)

---

[6] On January 31, 2020, our court clerk wrote to defense counsel advising of this deficiency. Defendants took no action in response to the letter.

(stating an order "clearly identified [in a] Case Information Statement submitted with [a] Notice of Appeal" is deemed properly before the court for review).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION